# EXHIBIT M

## HIGHLY CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY INFORMATION

Filed under seal pursuant to the terms of the Stipulated Protective Order (Dkt. No. 30)

Page 1

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____
                            )
CAMBRIA COMPANY LLC,        )
                            )
        Plaintiff,          )
                            )
    vs.                     )   Case No.
                            )   1:20-cv-508
LAKESIDE SURFACES,          )   (JMB/PJG)
INC.,                       )
                            )
        Defendant.          )
_____)


HIGHLY CONFIDENTIAL


Rule 30(b)(6) and Personal Deposition of
MATT NEIGER
Friday, April 1, 2022




REPORTED BY:   JOHN WISSENBACH, RDR, CRR, CRC,
               CSR 6862

Page 70

1  John.
2     Q.   There's a sign at Cambria --
3     A.   Yeah.
4     Q.   -- at the manufacturing plant that says
5  "Through these doors walk the finest countertop
6  makers in the world."
7     A.   Yep.
8     Q.   Did you see that sign on your tour?
9     A.   I don't recall if I saw it on that specific
10 tour.
11    Q.   Had you seen that sign on or before
12 September 10th, 2014?
13    A.   I don't recall.
14    Q.   Have you ever taken a picture of that sign?
15    A.   Yes.
16    Q.   When did you do that?
17    A.   In 2014.
18    Q.   Did you take a picture of that sign on
19 September 10th, 2014, Mr. Neiger?
20    A.   I don't know if I specifically did it on
21 September 10th, 2014, but I know in 2014 I took a
22 picture of that sign, yes.
23    Q.   Why did you take a picture of that sign?
24    A.   Mike Morton and I were giving a tour to
25 customers.  I don't know if it was on the trip that

Page 71

1  you're referencing in September of 2014.  I believe
2  we did multiple trips to the facility in 2014.  And
3  I believe there potentially was a trip prior to
4  September of 2014.
5         But I do know that I was on a tour with
6  Mike Morton, and Cambria was in the process of
7  installing those signs at their manufacturing
8  facility.  There was one sign that was up over the
9  main entrance of the manufacturing facility.  And I
10 commented to Mike that I really liked the sign.  And
11 Mike and I had a discussion about us, Lakeside,
12 putting the same sign over Lakeside's manufacturing
13 facilities.
14    Q.   When did this conversation with Mr. Morton
15 take place?
16    A.   It was in 2014.
17    Q.   Where --
18    A.   And I don't recall --
19    Q.   Fair enough.  Where did it take place?
20    A.   It took place at the manufacturing
21 facility.
22    Q.   Whose idea was it to put up the signs at
23 your shop?
24         MR. GOLDSTEIN:  Object to form and
25 foundation.

Page 72

1         THE WITNESS:  I would say that Mike and I
2  collaborated on the idea to put those over our
3  facility.
4  BY MR. ADKISSON:
5     Q.   The picture that you took --
6     A.   Yes.
7     Q.   -- do you still have it?
8     A.   I don't have it.  It was on a -- I believe
9  it was on a flip phone back in 2014, John.
10    Q.   Did you ever send that picture to anyone at
11 Lakeside?
12    A.   Yes, I believe I sent it to Ray Schelhas.
13    Q.   Did you -- strike that.
14         Is that picture still in Mr. Schelhas's
15 email?
16    A.   I wouldn't know that.
17    Q.   Has Mr. -- have Mr. Schelhas's emails been
18 searched in connection with this litigation?
19    A.   Yes.
20    Q.   Because we -- I just want to tell you,
21 Mr. Neiger, you know, we have been unable to find
22 that picture in Lakeside's production.  We've asked
23 Mr. Goldstein for it.  It's an important enough
24 piece of evidence in this case that I do think that
25 it's something that we're going to ask the Court to

Page 73

1  help us find.  I don't want to --
2     A.   Sure.
3     Q.   -- spend either -- I don't want to spend
4  either side's money fighting about that if it's
5  sitting in someone's email box.  So I'll follow up
6  with Mr. Goldstein after this deposition, but I'd
7  very much like to have that picture just because of
8  its importance to this case.
9         You said you've looked through -- on your
10 flip phone, and you don't have --
11    A.   Yeah, that's --
12    Q.   -- it anymore?
13    A.   Yeah, if I can respond to that, John.
14 We've provided over 330 documents in this case.
15 Mr. Schelhas did a very thorough search.
16 Mr. Schelhas has a track record of keeping things.
17 And I would tell you that if we had that picture, I
18 would be more than happy to provide it to you,
19 because I have nothing to hide.  However, it was
20 from 2014; and a picture on a phone, that was
21 emailed, I think it would be reasonable to think
22 that that would be deleted at some -- you know, and
23 certainly not after we got any notice from you guys,
24 because, again, going back to an earlier comment,
25 we're a company of integrity, and, you know, we're

Page 102

1  outside of your building is a use in commerce?
2       MR. GOLDSTEIN:  Asked and answered is the
3  objection.
4  BY MR. ADKISSON:
5       Q.  You can answer.
6       A.  I'm sorry.  Can you repeat the question?
7       Q.  You don't believe that putting the phrase
8  on the outside of your building is a use in
9  commerce?
10      A.  Well, it's not about what I believe.  I
11 think that -- I've been advised by my attorney that
12 that's not a use in commerce.
13      MR. GOLDSTEIN:  Well, I don't -- object
14 to -- I don't want to get any discussions with what
15 an attorney says to him, obviously.  So, again, I'm
16 going to object to the question, because it has been
17 asked and answered.
18      Go ahead.
19 BY MR. ADKISSON:
20      Q.  So you believe that trademarking the phrase
21 "Finest Countertop Makers in the World" -- that was
22 your idea, right, Mr. Neiger?
23      MR. GOLDSTEIN:  Well, object to the form.
24      THE WITNESS:  I believe it was my idea to
25 trademark the phrase "The Finest Countertop Makers

Page 103

1  in the World."
2  BY MR. ADKISSON:
3       Q.  Were you involved in the process of going
4  back and forth with the Patent and Trademark Office
5  about whether this was a phrase that could be
6  trademarked?
7       A.  I don't recall.
8       Q.  Who was your lawyer handling this on behalf
9  of Lakeside?
10      A.  Barry Kane.
11      Q.  How did you get introduced to Mr. Kane?
12      A.  I don't recall.
13      Q.  Did you personally interact with Mr. Kane
14 as this was going through the trademarking process?
15      A.  I don't recall specific interactions.
16      Q.  Okay.  So if he had questions about when
17 things were used or those types of questions, who
18 would have been the point person at Lakeside to
19 respond to them?
20      A.  Well, it's likely me.  But I don't want to
21 speculate.
22      Q.  Have you ever met Mr. Kane in person?
23      A.  I don't believe so.
24      (Deposition Exhibit 9 was marked for
25 identification.)

Page 104

1  BY MR. ADKISSON:
2       Q.  So Mr. Neiger, I'm going to put in the chat
3  as Exhibit 9 the trademark application.
4       A.  Okay.  Oh, crap, clicked on the wrong one.
5  Sorry about that.
6       MR. GOLDSTEIN:  All right.  Let me try this
7  and see.  So Exhibit 9.
8  BY MR. ADKISSON:
9       Q.  And I'll warn you in advance, these
10 documents tend to be a little dense, so -- but I've
11 got some questions as we go through them.
12      So if you could turn to the seventh page of
13 the PDF.
14      A.  Okay.
15      John, the pages aren't numbered, so I'm
16 assuming page 7 in the PDF reference?
17      Q.  Yes.  Yeah.  But I'll make sure we're in
18 the same -- all three of us are in the same place
19 before I go too far with these questions.
20      So there is a section here called "For
21 specific filing basis information for each item."
22 You see that?
23      It's the page 7 --
24      MR. GOLDSTEIN:  What page is that?
25 BY MR. ADKISSON:

Page 105

1       Q.  -- of the PDF.
2       MR. GOLDSTEIN:  Page 7?
3       MR. ADKISSON:  Page 7 of the PDF.
4       MR. GOLDSTEIN:  Okay.
5       MR. ADKISSON:  And there's a -- there's a
6  paragraph there that starts, "In International
7  Class" --
8       MR. GOLDSTEIN:  Right.
9       MR. ADKISSON:  -- "037."
10      Q.  Are you both there?
11      A.  I'm there.
12      MR. ADKISSON:  I'll wait for Robert to give
13 a thumbs-up.
14      MR. GOLDSTEIN:  I'm there.  Yeah.  I'm
15 sorry.  I'm there.
16      MR. ADKISSON:  That's fine.
17      Q.  It says, "In International Class 037, the
18 mark was first used by the applicant or the
19 applicant's related company or licensee predecessor
20 in interest at least as early as" August 1st, 2015,
21 "and first used in commerce at least as early as"
22 August 15th, 2015, "and is now in" such "use
23 in...commerce."  Do you see that?
24      A.  I'm sorry, John.  I missed that.
25      Q.  That's fine.

Page 106

1   A.   Is that -- can you tell me what --
2 reference what paragraph you're on -- in on that
3 page.
4   Q.   It's the paragraph that starts, "In
5 International Class 037."
6   A.   Okay.  I'm there.
7   Q.   Okay.  And I won't read it all again, but
8 in there it gives a few dates.  So the first date is
9 when the mark was first used, and that date is
10 August 1st, 2015.  Do you see that?
11   A.   I do.
12   Q.   The next date it gives is "first used in
13 commerce at least as early as" August 15, 2015.  Do
14 you see that?
15   A.   I do see that, yeah.
16   Q.   And then it says "and is now in use in such
17 commerce."
18        So my question to you is -- and let's walk
19 through each of these dates -- is how they were each
20 selected.  How were you able to select the August
21 1st, 2015 date as the date of first use?
22        MR. GOLDSTEIN:  I'm going to object to the
23 form and the foundation.
24        THE WITNESS:  I don't recall.
25 BY MR. ADKISSON:

Page 107

1   Q.   We've established that you saw the
2 nontruncated version of the phrase used at Cambria
3 at least as early as September of 2014, correct?
4   A.   Can you repeat that?
5   Q.   We've established that you saw the
6 nontruncated version of the phrase being used at
7 Cambria at least as early as September of 2014,
8 correct?
9   A.   Well, I saw the other phrase, that was used
10 on the signage at Cambria.
11   Q.   The nontruncated version of the phrase?
12   A.   I'm not sure if "nontruncated" is apt -- is
13 a -- is a -- is a fair representation.
14   Q.   Well, we'll call it whatever you want to
15 call it.  You saw what you're calling the other
16 version of the phrase being used at Cambria as least
17 as early as September of 2014, correct?
18   A.   Yeah, I'd prefer to call it "the other
19 phrase."
20   Q.   That's fine.  But the dates match up.
21 Right?
22        So you were aware of that at least as early
23 as September of 2014, correct?
24        MR. GOLDSTEIN:  Object to the form.
25        Go ahead.

Page 108

1 BY MR. ADKISSON:
2   Q.   You can answer, Mr. Neiger.
3   A.   Yeah, I'm sorry.  Can you repeat the
4 question?
5   Q.   Sure.  You were aware of the other version
6 of the phrase being used at Cambria at least as
7 early as September of 2014, correct?
8   A.   I don't recall specifically when I saw it
9 being used at Cambria.  I mean, I -- I would assume
10 that that September date is -- you know, there's a
11 possibility that it's accurate.
12   Q.   Well, we saw you coming back from Cambria
13 and then asking your graphic designer to give you
14 some options --
15   A.   Yeah.
16   Q.   -- right?  That was all --
17   A.   Yes.
18   Q.   That was all September of 2014, right?
19   A.   Yes.
20   Q.   Okay.
21   A.   Yes, so I'm assuming that's accurate.
22   Q.   Okay.
23   A.   Yeah.
24   Q.   Did you tell the Patent and Trademark
25 Office about what you had seen at Cambria in

Page 109

1 September of 2014?
2        MR. GOLDSTEIN:  Objection to form and
3 foundation.
4        And answer if you can.
5        THE WITNESS:  I don't recall.
6 BY MR. ADKISSON:
7   Q.   Do you believe that you might have told the
8 Patent and Trademark Office about what you saw at
9 Cambria in September of 2014?
10        MR. GOLDSTEIN:  Objection; asked and
11 answered.
12        THE WITNESS:  I think I just answered that.
13 BY MR. ADKISSON:
14   Q.   Okay.  Well, let me represent to you that
15 I'm not aware of you telling the patent office what
16 you saw at Cambria in September of 2014.  Do you
17 remember actually telling the Patent and Trademark
18 Office about that?
19        MR. GOLDSTEIN:  Same objection:  asked and
20 answered.  But go ahead.
21        THE WITNESS:  I don't recall.
22 BY MR. ADKISSON:
23   Q.   Why didn't you tell the Patent and
24 Trademark Office about what you saw at Cambria in
25 September of 2014?

Page 110

1    MR. GOLDSTEIN: Objection to the form and
2 foundation. And then it is -- the form
3 particularly. That's not what he said.
4    THE WITNESS: I'm sorry. Can you repeat
5 that question?
6 BY MR. ADKISSON:
7    Q. Why didn't you tell the Patent and
8 Trademark Office about what you saw at Cambria in
9 September of 2014?
10   A. When you say what I saw, are you referring
11 to the other phrase?
12   Q. I'm referring to the nontruncated phrase,
13 that you'd like to call the other phrase.
14   A. Okay. I don't recall.
15   Q. In this paragraph, you say that Lakeside
16 was the first to use this phrase. Do you see that?
17      MR. GOLDSTEIN: Objection to the form and
18 the foundation.
19      THE WITNESS: Can you point me to that
20 specific spot on the document?
21 BY MR. ADKISSON:
22   Q. Sure. It's --
23   A. Thank you.
24   Q. -- the paragraph that starts, "In
25 International Class 037, the mark was first used by

Page 111

1 the applicant or the applicant's related company or
2 licensee predecessor in interest at least as early
3 as" August 1st, 2015. Do you see that?
4    A. I do see that.
5    Q. Are you telling the trademark office that
6 you were the first to have used that phrase?
7       MR. GOLDSTEIN: Object to the form and
8 foundation.
9       THE WITNESS: We're telling the trademark
10 office what that says: "the mark was first used by
11 the applicant," and then obviously you can read the
12 rest. But that's what we're telling the trademark
13 office.
14 BY MR. ADKISSON:
15   Q. Are you aware of any other companies using
16 that phrase prior to August 1st of 2015?
17   A. We're -- you're referencing the trademarked
18 phrase?
19   Q. Correct.
20   A. I am not.
21   Q. So if we -- if we focus just on the phrase
22 that you trademarked, "The Finest Countertop Makers
23 in the World" --
24   A. Yep.
25   Q. -- you believe that Lakeside was the first

Page 112

1 to use that phrase?
2    A. Yes.
3    Q. Let's go down to the eighth page of the
4 PDF. There's something called a declaration there.
5 Do you see that?
6    A. I do.
7    Q. Okay. And, again, there's a lot of
8 verbiage in here, but I -- I want to focus on a
9 sentence that starts about midway through, that
10 starts "The signatory." Do you see that?
11   A. I do see that.
12   Q. This says -- and by "the signatory," you
13 see below where Mr. Kane is signing on behalf of
14 Lakeside. Do you see that? It's an electronic
15 signature, but it's got his signature on it.
16   A. Yes, I do see it.
17   Q. Okay. It says, "The signatory believes
18 that to the best of the signatory's knowledge and
19 belief, no other persons except, if applicable,
20 concurrent users, have the right to use the mark in
21 commerce, either in the identical form or in such
22 near resemblance as to be likely, when used on or in
23 connection with the goods/services of such other
24 persons, to cause confusion or mistake, or to
25 deceive." Do you see that?

Page 113

1    A. I do see that.
2    Q. And then after that, it talks about "The
3 signatory being warned that willful false
4 statements...are punishable by fine or
5 imprisonment...and that...willful false
6 statements...may jeopardize the validity of the
7 application or any registration resulting
8 therefrom," and declarant states that all -- "all
9 statements made" are -- "of his" or "her own
10 knowledge are true and all statements made on
11 information and belief are believed to be true." Do
12 you see that?
13   A. I do see that.
14   Q. That's what Mr. Kane is telling the Patent
15 and Trademark Office when you're trying to get this
16 trademark, right?
17      MR. GOLDSTEIN: Objection to form and
18 foundation.
19 BY MR. ADKISSON:
20   Q. You see that?
21      MR. GOLDSTEIN: You're asking --
22      THE WITNESS: Yeah.
23      MR. GOLDSTEIN: -- for speculation.
24      THE WITNESS: I see Mr. Kane's signature on
25 the document that we're discussing, yes.

Page 114

1  BY MR. ADKISSON:
2     Q.  If I take you back to the beginning of that
3  sentence, you're saying that "The signatory believes
4  that to the best of the signatory's knowledge and
5  belief, no other persons, except, if applicable,
6  concurrent users, have the right to use the mark in
7  commerce," that --
8        MR. GOLDSTEIN:  Again --
9  BY MR. ADKISSON:
10    Q.  -- essentially nobody else has the right to
11 use the phrase that you're trying to trademark.  Do
12 you see that?
13       So is it your testimony, Mr. Neiger, that
14 Cambria doesn't have the right to use the phrase
15 that you trademarked?
16       MR. GOLDSTEIN:  I'm going to object to the
17 form and foundation.  And you're asking him for a
18 legal conclusion here.
19       Go ahead.
20 BY MR. ADKISSON:
21    Q.  You can answer, Mr. Neiger.
22    A.  I'm sorry, John.  I felt like you asked me
23 a couple questions there.  Can you ask -- can you
24 restate the question, please?
25    Q.  Yeah, I'll go -- I'll make it shorter.

Page 115

1     A.  Thank you.
2     Q.  Does Cambria have the right to use the
3  phrase "The Finest Countertop Makers in the World"?
4        MR. GOLDSTEIN:  Same objection.  You're
5  asking for a legal conclusion.
6        THE WITNESS:  Yeah, I don't know how I can
7  answer that, because it's -- you're asking me for a
8  legal conclusion, as Robert stated.
9  BY MR. ADKISSON:
10    Q.  So you don't know?  Cambria might be able
11 to use the phrase?
12    A.  I don't know.
13       MR. GOLDSTEIN:  Object.
14 BY MR. ADKISSON:
15    Q.  Can you point the ladies and gentlemen of
16 the jury to any disclosure by Lakeside of the signs
17 you saw at Cambria's facility on or before September
18 2014?
19       MR. GOLDSTEIN:  I guess -- can you repeat
20 the question?  I don't understand it, John.
21 BY MR. ADKISSON:
22    Q.  Can you point the ladies and gentlemen of
23 the jury to any disclosure, to -- Lakeside, to the
24 Patent and Trademark Office of the signage you saw
25 at Cambria on or before September 2014?

Page 116

1     A.  I don't recall.
2        MR. GOLDSTEIN:  I'm going to object to the
3  form.  Okay.
4  BY MR. ADKISSON:
5     Q.  Did you ever tell the trademark office,
6  "Hey, we're just trying to do a -- we're just trying
7  to trademark a truncated version of the phrase we
8  saw at Cambria?"  Did you ever tell the trademark --
9        MR. GOLDSTEIN:  Objection.
10 BY MR. ADKISSON:
11    Q.  -- office that?
12       MR. GOLDSTEIN:  Objection to form and
13 foundation.
14 BY MR. ADKISSON:
15    Q.  Did you ever tell the trademark office
16 that?
17       MR. GOLDSTEIN:  Objection to form and
18 foundation.  And I think this has already been asked
19 and answered.
20       THE WITNESS:  I think I've already
21 answered.
22 BY MR. ADKISSON:
23    Q.  And the answer is you don't know whether
24 you told the trademark office that, right?
25       MR. GOLDSTEIN:  Objection to the form.

Page 117

1  BY MR. ADKISSON:
2     Q.  Was your lawyer aware of the fact that you
3  had seen this phrase at Cambria in September of
4  2014?
5        MR. GOLDSTEIN:  Object to form.
6        Go ahead.
7        THE WITNESS:  I don't recall.
8  BY MR. ADKISSON:
9     Q.  You had talked earlier about being a
10 business partner with Cambria and some conversations
11 you said you thought gave you permission to put the
12 signs up at Lakeside's facilities.  What
13 conversations did you have with Cambria about your
14 attempts to trademark the truncated version of the
15 phrase that was hanging in Cambria's facility?
16    A.  I don't recall.
17    Q.  Did you ever pick up the phone and call
18 Mr. Morton and say, "Hey, we're going to try to
19 trademark a truncated version of the phrase"?
20    A.  I don't recall.
21    Q.  You do recall the conversation where you
22 thought he gave you permission, but you don't recall
23 ever picking up the phone and doing the opposite?
24       MR. GOLDSTEIN:  Objection to the form of
25 the question.